Estado Libre Asociado de Puerto Rico
TRIBUNAL DE APELACIONES
PANEL ESPECIAL

| ELISON RÍOS REYES MARÍA REYES HUERTAS Apelantes v. HOSPITAL METROPOLITANO DE SAN JUAN; DRA. MILCIADES MERCEDES MALDONADO; SINDICATO DE ASEGURADORES DE IMPERICIA MÉDICA (SIMED) Y OTROS Apelados | KLAN202401163 | *Apelación* procedente del Tribunal de Primera Instancia, Sala de San Juan Caso Núm.: SJ2022CV03568 (801) Sobre: Daños y Perjuicios |
| --- | --- | --- |

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero, el Juez Campos Pérez y el Juez Sánchez Báez.

Rodríguez Casillas, juez ponente.

**SENTENCIA**

En San Juan, Puerto Rico, a 29 de mayo de 2025.

Comparece ante nos el Sr. Elison Ríos Reyes (en adelante, "señor Ríos Reyes") y la Sra. María Reyes Huertas (en adelante, "señora Reyes Huertas") (en conjunto, "parte apelante o apelantes"), para que revoquemos la *Sentencia* emitida el **23 de octubre de 2024**,[1] por el Tribunal de Primera Instancia, Sala Superior de San Juan (en adelante, "TPI"). Allí, se acogió la solicitud de sentencia sumaria presentada por Metrohealth, Inc., h/n/c Hospital Metropolitano (en adelante, "Hospital Metropolitano"), a la cual se unieron el Dr. Milcíades Mercedes Maldonado (en adelante, "doctor Mercedes") y el Sindicato de Aseguradores para la Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria,[2] (en adelante, "SIMED") (en conjunto, "parte apelada o apelados"). En consecuencia, el TPI desestimó con perjuicio la

---

[1] Notificada el 24 de octubre de 2024.
[2] Como aseguradora del doctor Mercedes.

Número Identificador
RES2025_____

*Demanda* sobre daños por impericia médica presentada por la parte apelante.

Por los fundamentos que esbozamos a continuación, **confirmamos** la *Sentencia* emitida por el TPI.

-I-

El **5 de mayo de 2022**,[3] la parte apelante presentó una *Demanda* contra la parte apelada sobre daños y perjuicios por impericia médico-hospitalaria.[4] En resumen, adujo que el señor Miguel Ríos Rivera (en adelante, "señor Ríos Rivera"), esposo de la señora Reyes Huertas y padre del señor Ríos Reyes, acudió el **7 de mayo de 2021** al Hospital Metropolitano por tos, fiebre, problemas respiratorios y dolor abdominal. Le diagnosticaron el virus de **COVID-19** y fue hospitalizado bajo el cuidado del doctor Mercedes, quien le administró diariamente el medicamento antiviral *dexamethasone*, conocido comúnmente como *Decadron* (en adelante, "*Decadron*").

El **11 de mayo de 2021**, el doctor Mercedes dio de alta al señor Ríos Rivera y para el tratamiento del virus le prescribió *methylprednisolone*, conocido comúnmente como *Medrol Dosepak* (en adelante, "*Medrol Dosepak*").

El **17 de mayo de 2021**, el señor Ríos Rivera falleció y los apelantes le imputaron negligencia a los apeladas en el cuidado médico del señor Ríos Rivera al no administrarle el medicamento *Remdesivir*, un antiviral comúnmente utilizado para detener la progresión del virus COVID-19, y por haberle dado de alta prematuramente a pesar de su grave estado de salud y el riesgo de complicaciones.

---

[3] Enmendada el 14 de noviembre de 2022.
[4] Apéndice III del Recurso de Apelación, a las págs. 9-14.

El **16 de noviembre de 2022**, el Hospital Metropolitano contestó la demanda enmendada.[5] En esencia, negó que haya mediado negligencia en el cuidado médico del señor Ríos Rivera y que, al momento de darle el alta, el paciente presentaba un cuadro médico estable. De igual forma, alegó estar cobijada por la inmunidad conferida por la ley del Congreso federal *Public Readiness and Emergency Preparedness Act*, 42 USC sec. 247d-6d, *et seq.* (en adelante, "PREP Act").

Asimismo, el **14 de febrero de 2023** el doctor Mercedes y SIMED presentaron contestaron la demanda enmendada y adujeron planteamientos similares.[6]

Tras varios trámites procesales, se condujo el descubrimiento de pruebas que incluyó la toma de deposiciones a los peritos de ambas partes. Posteriormente, el **29 de mayo de 2024** el Hospital Metropolitano presentó el escrito intitulado *Motion for Summary Judgment*,[7] a la que se unió el Dr. Mercedes y SIMED.[8] En síntesis, la moción propuso sesenta y cuatro (64) hechos esenciales incontrovertidos que destacan la aplicabilidad de la inmunidad otorgada por el estatuto PREP Act y la ausencia de hechos en controversia en el presente caso, por lo que solicitó la desestimación de la demanda. Además, acompañó a su solicitud con los siguientes documentos: **(A)** *Licencia del Hospital Metropolitano para operar como institución hospitalaria;*[9] **(B)** *Certificación de registro y educación médica del Dr. Miguel A. Rosado Serra;*[10] **(C)** *Verificación de licencia "Good Standing" del Dr. Alexis Rivera González;*[11] **(D)** *Diploma de Medicina Interna otorgado por la American Board of*

---

[5] Apéndice IV del Recurso de Apelación, a las págs. 15-20.
[6] Apéndice VI del Recurso de Apelación, a las págs. 029-032.
[7] Apéndice IX del Recurso de Apelación, págs. 071-440.
[8] Entrada núm. 77 de SUMAC.
[9] Apéndice IX del Recurso de Apelación, a la pág. 104.
[10] *Íd.*, a la pág. 105.
[11] *Íd.*, a la pág. 106.

*Internal Medicine al Dr. Milcíades Mercedes Maldonado;*[12] **(E)** *Certificación de registro y educación médica del Dr. Milcíades Mercedes Maldonado;*[13] **(F)** *Certificado de "fellowship" en enfermades infecciosas otorgado por el Departamento de Asuntos de los Veteranos al Dr. Carmelo Santana López;*[14] **(G)** *Certificación de registro y educación médica del Dr. Carmelo Santana López;*[15] **(H)** *Certificado de "fellowship" en Neumología y cuidados intensivos otorgado por el Departamento de Asuntos de los Veteranos al Dr. José R. Adorno Fontánez;*[16] **(I)** *Certificación de registro y educación médica del Dr. José R. Adorno Fontánez;*[17] **(J)** *Declaración del Secretario de Salud federal del COVID-19 como emergencia nacional de salud pública;*[18] **(K)** *Boletín Administrativo Núm. OE-2020-020 emitido por la Hon. Wanda Vázquez Garced, Gobernadora de Puerto Rico, declarando estado de emergencia en Puerto Rico por el impacto del COVID-19;*[19] **(L)** *Boletín Administrativo Núm. OE-2020-036 emitido por la Hon. Wanda Vázquez Garced, Gobernadora de Puerto Rico, concediendo inmunidad en demandas por impericia médica a facilidades y profesionales médico-hospitalarias por sus actuaciones mientras asistieron al Gobierno en la respuesta a la emergencia del COVID-19;*[20] **(M)** *Declaración del Secretario de Salud federal poniendo fin a la emergencia nacional de salud pública por COVID-19;*[21] **(N)** *Boletín Administrativo Núm. OE-2023-012 emitido por el Hon. Pedro R. Pierluisi Urrutia, Gobernador de Puerto Rico, poniendo fin al estado de emergencia en Puerto Rico por el COVID-19;*[22] **(O)** *Récord médico*

---

[12] *Íd.*, a la pág. 107.
[13] *Íd.*, a la pág. 108.
[14] *Íd.*, a la pág. 109.
[15] *Íd.*, a la pág. 110.
[16] *Íd.*, a la pág. 111.
[17] *Íd.*, a la pág. 112.
[18] *Íd.*, a las págs. 113-118.
[19] *Íd.*, a las págs. 119-121.
[20] *Íd.*, a las págs. 122-126.
[21] *Íd.*, a las págs. 127-136.
[22] *Íd.*, a las págs. 137-142.

*del señor Miguel Ríos Rivera en el Hospital Metropolitano;*[23] **(P)** *Deposición tomada al Dr. Ian H. Newmark.*[24]

El **22 de julio de 2024**, la parte apelante presentó una *Oposición a Moción de Sentencia Sumaria.*[25] En síntesis, admitió los sesenta y cuatro (64) hechos incontrovertidos propuestos por Hospital Metropolitano; sin embargo, realizó varias cualificaciones correspondientes a la interpretación de algunos hechos. No obstante, arguyó que no procedía como, cuestión de derecho, la disposición del caso por vía sumaria, toda vez que no era de aplicación la inmunidad alegada por la parte apelada al amparo del estatuto PREP Act. Esto por cuanto la falta de administración del medicamento *Remdesivir* al señor Ríos Rivera, como contramedida al COVID-19, excluye a la parte apelada del ámbito inmunitario del referido estatuto federal. Igualmente, arguyó que existían controversias de hechos esenciales dado que los testimonios de los peritos de ambas partes presentaron posiciones encontradas en cuanto a la alegada negligencia médico-hospitalaria. Además, propuso dieciocho (18) hechos esenciales incontrovertidos. Acompañó su escrito en oposición con los siguientes documentos: **(A)** *Informe pericial del Dr. Ian H. Newmark;*[26] **(B)** *Deposición tomada al Dr. Jesús R. Casal Hidalgo;*[27] **(C)** *Deposición tomada al Dr. Miguel A. Colón Pérez.*[28]

El **13 de agosto de 2024**, Hospital Metropolitano replicó la oposición presentada por la parte apelante, a través del escrito intitulado *Reply to Plaintiff's Opposition to Motion for Summary Judgment.*[29] En esencia, resaltó que la parte apelante aceptó en su totalidad los hechos esenciales propuestos como incontrovertidos en

---

[23] *Íd.*, a las págs. 143-336.
[24] *Íd.*, a las págs. 337-440.
[25] Apéndice XI del Recurso de Apelación, a las págs. 441-583.
[26] *Íd.*, a las págs. 456-457.
[27] *Íd.*, a las págs. 458-522.
[28] *Íd.*, a las págs. 523-583.
[29] Apéndice XII del Recurso de Apelación, a las págs. 584-642.

la moción de sentencia sumaria. Además, alegó que las cualificaciones y las propuestas de hechos esenciales incontrovertidos que la parte apelante realizó en su escrito no eran consecuentes a la aplicabilidad del estatuto federal PREP Act, por lo que, como cuestión de derecho, procedía la disposición del caso por la vía sumaria. También, refutó la jurisprudencia citada por la parte apelante aduciendo que no era aplicable a la controversia planteada, sino que se refería a asuntos de índole jurisdiccional en cuanto a si las acciones por impericia médica, en las que se levantó el PREP Act como defensa, correspondían a la jurisdicción estatal o federal.

El **23 de octubre de 2024**,[30] el TPI acogió la moción y dictó sentencia sumaria.[31] Determinó que los siguientes hechos no estaban en controversia:

1. *Durante el periodo del 10 de noviembre de 2020 al 10 de noviembre de 2022, el Hospital Metropolitano contaba con una licencia expedida por el Departamento de Salud para operar como una entidad hospitalaria.*

2. *El Dr. Miguel Rosado, Dr. Alexis Rivera, Dr. Milciades Mercedes, Dr. Carmelo Santana y el Dr. José Adorno, son médicos autorizados a practicar la medicina y cirugía en Puerto Rico.*

3. *A partir del 4 de febrero de 2020, el Secretario de Salud y Servicios Humanos de los Estados Unidos (Secretario) declaró el COVID-19 una emergencia de salud pública e invocó la Ley PREP para atender la situación creada por la pandemia.*

4. *Conforme la Sección VI de la Declaración del 10 de marzo de 2020 emitida por el Secretario en virtud de la Ley PREP, los "covered countermeasures" incluyen el uso de cualquier antiviral, medicamento, biológico, diagnóstico, dispositivo o vacuna utilizado para tratar, diagnosticar, curar, prevenir o mitigar el COVID-19, o la transmisión del SARS-CoV-2 o un virus mutante del mismo, o cualquier dispositivo utilizado en la administración de dicho producto, y todos los componentes y materiales constituyentes de dicho producto.*

5. *El Secretario recomendó el uso y la administración de "couvered countermeasures" durante a emergencia sanitaria del COVID-19.*

6. *El Secretario determinó que el grupo para el cual la inmunidad de la Ley PREP cubre, con respecto a la administración o el uso de una contramedida incluye, cualquier persona que use o administre una contramedida*

---

[30] Notificada el 24 de octubre de 2024.
[31] Apéndice XIII del Recurso de Apelación, a las págs. 642-655.

*cubierta. Más aun, esa inmunidad incluye a los planificadores de programas cuando la contramedida es utilizada o administrada a la población.*

7. *El Secretario determinó que dicha inmunidad resultante de la administración o uso de una contramedida cubierta aplica sin limitaciones geográficas.*

8. *El 12 de marzo de 2020, la gobernadora de Puerto Rico Wanda Vázquez Garced, declaró un estado de emergencia como resultado de la pandemia causada por el brote de COVID-19.*

9. *Conforme la Sección 3 de la Orden Ejecutiva OE-2020-036 emitida por la gobernadora, "Facilidades de Salud" significa:*

   *[C]ualesquiera de los establecimientos que se dedican a la prestación de servicios a la comunidad de diagnóstico, tratamiento y/o cuidado médico y/o quirúrgico para enfermedades o lesiones y/o tratamiento obstétrico tales como hospitales generales y especiales, Centros de Diagnóstico y Tratamiento, centros de rehabilitación, facilidades de cuidado extendido, casas de salud, centros de rehabilitación, centro de enfermedades renales, incluyendo unidades ambulatorias de hemodiálisis, centros de cirugía ambulatoria, programas de servicios de salud en el hogar, laboratorios clínicos, facilidades radiológicas, consultorios médicos, clínicas de salud, servicios de telemedicina, servicios médicos al hogar, departamentos de tele-consulta, entre otros. Entiéndase además por facilidad de salud a toda institución dedicada a la prestación de servicios de salud incluyendo:*

   i. *Toda facilidad cuya operación esté autorizada mediante una licencia, certificación o esté aprobada mediante ley y/o reglamentación del Gobierno de Puerto Rico incluyendo: Ley Núm. 101 de 26 de junio de 1965, según enmendada y su reglamentación aplicable; y la Ley Núm. 2 de 7 de noviembre de 1975, p. 1010, según enmendada y su reglamentación aplicable.*

   ii. *Toda facilidad cuya operación esté autorizada mediante legislación federal para proveer servicios de salud a la comunidad.*

   iii. *Cualquier instalación o facilidad de salud establecida o autorizada por el Gobierno de Puerto Rico con el propósito de proveer servicios de salud como parte de los esfuerzos de respuesta de emergencia ante la pandemia del COVID-19.*

10. *Conforme la Sección 6 de la Orden Ejecutiva OE-2020-036 emitida por la gobernadora, se ordenó a todas las facilidades y profesionales de la salud, dirigir sus esfuerzos y asistir en el esfuerzo de respuesta del Gobierno de Puerto Rico ante la emergencia de salud provocada por el COVID-19.*

11. *El Hospital Metropolitano, sus funcionarios, agentes, empleados, contratistas y voluntarios son personas cubiertas por la Ley PREP, pues se le considera "persona calificada" por el gobierno para recetar, administrar, entregar, distribuir o dispensar Contramedidas Cubiertas después de la declaración de una emergencia.*

12. El Hospital Metropolitano también goza de inmunidad conforme la declaración del 10 de marzo de 2020, pues es considerado un "program planner" que supervisa y administra un programa para la dispensación, distribución, provisión o uso de contramedidas cubiertas. Bajo dicha definición, un empleador del sector privado o un grupo comunitario u otra "persona" puede ser un "program planner" si realiza dichas actividades.

13. A nivel federal, la declaración de emergencia por COVID-19 finalizó el 11 de mayo de 2023[.]

14. A nivel estatal, la declaratoria de emergencia por COVID finalizó el 11 de mayo de 2023.

15. El Sr. Ríos Rivera, acudió a la sala de emergencias del Hospital Metropolitano el 7 de mayo de 2021, a las 8:32 pm. Sus quejas principales eran tos, fiebre, dificultad respiratoria y dolor abdominal.

16. Durante la evaluación inicial se le tomó la temperatura y se midió su nivel de saturación de oxígeno con un oxímetro de pulso.

17. La toma de temperatura al paciente es parte del proceso de detección y diagnóstico de la COVID-19.

18. El nivel de saturación de oxígeno se toma como parte del proceso de diagnóstico de COVID-19.

19. El Sr. Ríos Rivera fue evaluado a las 10:41 p.m., por el Dr. Miguel A. Rosado Serra.

20. El diagnóstico inicial del Dr. Rosado Serra fue de infección por Coronavirus.

21. Ante la presencia de los síntomas de COVID, el Dr. Rosado Serra ordenó a las 10:49 pm que se le administrara una inyección intramuscular de 4mg/ml de dexamethasone (Decadron) al Sr. Ríos Rivera.

22. A las 10:50 pm el Dr. Rosado Serra ordenó que se le realizara una prueba para detectar la presencia de antígenos del COVID 19.

23. La inyección de dexamethasone (Decadron) se le administró al Sr. Ríos Rivera.

24. El resultado de la prueba de antígenos reflejó que estaba positivo a COVID 19 y se recibió el 8 de mayo de 2021, a las 12:34 a.m.

25. Dicho resultado se informó al Dr. Rosado Serra a las 12:35 a.m. de ese mismo día.

26. El diagnóstico final del Dr. Rosado Serra fue de bronconeumonía, infección por coronavirus y fiebre.

27. El Dr. Alexis Rivera González evaluó al paciente y ordenó su hospitalización al cuidado del Dr. Milciades Mercedes Maldonado, el 8 de mayo de 2021, a las 12:25 pm con un diagnóstico de infección por Coronavirus.

28. El Dr. Rivera González le ordenó una prueba PCR (prueba molecular) de COVID-19 el 8 de mayo de 2021, a las 12:35 pm.

29. El 8 de mayo de 2021, a la 1:27 pm se recibió el resultado positivo de la prueba SARSCoV-2 (prueba molecular).

30. El 8 de mayo de 2021, a las 3:44 pm, el Sr. Ríos Rivera fue evaluado por el Dr. Carmelo Santana. Este determinó que el paciente tenía COVID-19 y podía beneficiarse de esteroides intravenosos. Como parte del plan de tratamiento determinó que se le debía continuar suministrando 6 mg de dexamethasone por vía intravenosa diariamente.

31. El Dr. Carmelo Santana tiene una especialidad en enfermedades infecciosas.

32. El 8 de mayo de 2021, a las 5:00 pm se le administró dexametasona (Decadron) al paciente.

33. El Sr. Ríos Rivera fue evaluado por el Dr. José Adorno Fontánez, el 9 de mayo de 2021, a las 8:20 a.m. Resultado de su evaluación determinó que tenía COVID-19 y no había evidencia de neumonía. Como parte de la nota del expediente hizo constar que, a dicha fecha, existían limitadas opciones terapéuticas, que incluían el uso de dexametasona, remdesivir y tocilizumab. Recomendó que se siguiera la recomendación del especialista en enfermedades infecciosas con relación al tratamiento de la infección por COVID-19.

34. El Dr. José Adorno Fontánez, tiene una especialidad en "pulmonary and critical care medicine".

35. El 9 de mayo de 2021, a las 9:00 a.m. se administró nuevamente al Sr. Ríos Rivera dexametasona (Decadron).

36. El 10 de mayo de 2021, el Dr. Mercedes evaluó al paciente y tomó conocimiento de las recomendaciones del infectólogo y neumólogo.

37. El 10 de mayo de 2021, se continuó administrando dexametasona (Decadron) al paciente.

38. El 11 de mayo de 2021, a las 9:00 a.m., se le volvió a administrar dexametasona (Decadron).

39. El 11 de mayo de 2021, a las 2:19 pm el Sr. Ríos Rivera fue evaluado por el Dr. Mercedes, quien procedió a dar de alta al paciente.

40. En vista de la existencia del diagnóstico de COVID-19, al darlo de alta el Dr. Mercedes le dio una receta de "Medrol Dose Pack" (Metilprednisolona) como tratamiento para su infección[.]

41. Durante el tiempo que el Sr. Ríos Rivera fue atendido en el Hospital Metropolitano, estaba vigente a nivel federal y estatal la declaratoria de emergencia por la pandemia del COVID 19.

42. Al Dr. Ian Newmark (Dr. Newark), perito de la parte demandante, se le tomó una deposición el 21 de marzo de 2024.

43. *El Dr. Newmark admitió durante su deposición que un hospital que tiene una licencia para operar está autorizado para recetar, administrar y proporcionar pruebas para detectar COVID-19.*

44. *El Dr. Newmark admitió durante su deposición, que un hospital que tiene una licencia para operar está autorizado para recetar, administrar y proporcionar medicamentos o drogas para tratar, curar, mitigar o limitar el daño de COVID-19.*

45. *El Dr. Newmark admitió durante su deposición que los médicos licenciados por el Estado están autorizados a recetar, administrar y proporcionar pruebas para diagnosticar COVID-19.*

46. *El Dr. Newmark admitió durante su deposición que los médicos licenciados están autorizados a recetar, administrar y proporcionar medicamentos o drogas para tratar, curar, mitigar o limitar el COVID-19.*

47. *El perito de la parte demandante también admitió que el médico de la sala de emergencias que evaluó al Sr. Ríos Rivera hizo un diagnóstico preliminar de COVID-19.*

48. *El Dr. Newmark admitió que el médico de la sala de emergencias también ordenó una prueba de antígeno COVID-19 y Decadron (dexametasona).*

49. *El Dr. Newmark admitió que dicha dexametasona se le administró al paciente.*

50. *El Dr. Newark no cuestionó la corrección del uso de dexametasona en este paciente.*

51. *El Dr. Newark coincide con la decisión del uso de dexametasona en este paciente, pero entiende que casi siempre se usa en conjunto con Remdesivir.*

52. *El Dr. Newmark reconoce que el Decadron (dexametasona), es un esteroide que se usa como tratamiento para tratar, curar, mitigar o limitar el daño de COVID-19.*

53. *El Dr. Newmark admitió durante su deposición que la dexametasona es un corticosteroide aprobado por la FDA.*

54. *El Dr. Newmark admitió que, para mayo de 2021, la dexametasona era un medicamento utilizado activamente para tratar, curar, mitigar o limitar el daño de la COVID 19 pero entiende que casi siempre se usa en conjunto con Remdesivir.*

55. *El Dr. Newmark admitió durante su deposición que, en el Hospital Metropolitano, se le administró una prueba de antígeno COVID al paciente, con el propósito de diagnosticar COVID-19.*

56. *El Dr. Newmark admite que la prueba de antígenos COVID-19 realizada en el Hospital Metropolitano fue autorizada por la FDA para ser utilizada durante la emergencia de la pandemia de COVID-19.*

57. *El Dr. Newmark admitió que el 8 de mayo de 2021, la prueba de antígenos a COVID dio positivo.*

58. El Dr. Newmark admitió que el 8 de mayo de 2021, a las 12:25 p.m., el Dr. Alexis Rivera González ordenó una prueba PCR (prueba molecular) COVID que resultó positiva.

59. El Dr. Newmark admite que el propósito de la prueba PCR de COVID es diagnosticar COVID-19.

60. El Dr. Newmark admitió que la prueba PCR de COVID fue autorizada por la FDA para su uso durante la emergencia de la pandemia de COVID-19.

61. El Dr. Newmark admitió que el 8 de mayo de 2021, cuando se reevaluó al paciente, el COVID-19 fue uno de los diagnósticos que se le hicieron al paciente.

62. El Dr. Newmark admitió que al momento del alta se le dio una receta de Medrol Dose Pack (Metilprednisolona), un corticosteroide, pues había dado positivo a COVID-19.

63. El Dr. Newmark declaró en su deposición, que para mayo de 2021 la metilprednisolona era un medicamento o fármaco aprobado por la FDA, que, aunque no era generalmente utilizado, era una alternativa para sustituir el uso de dexametasona como tratamiento para tratar, curar, mitigar o limitar los efectos o daños del COVID-19.

64. El Dr. Newmark difiere de haber usado solamente dexametasona en este paciente, pues en su opinión se le debió suministrar junto al medicamento Remdesivir.

65. Durante la estadía del Sr. Ríos Rivera en el Hospital Metropolitano, ni el Dr. Mercedes Maldonado ni los demás facultativos que lo vieron le ordenaron el uso del medicamento antiviral Remdesivir.

66. El Sr. Ríos Rivera, falleció el 17 de mayo de 2021, en su residencia.

67. El Sr. Ríos Rivera medía 5'11" y pesaba 354 lbs. y tenía historial de hipertensión y obesidad mórbida.

68. Durante su deposición el Dr. Newark declaró que en su experiencia la gran mayoría de los pacientes de COVID 19 que reciben Remdesivir de manera oportuna, no fallecen.

69. Durante su deposición el Dr. Newark declaró que el Sr. Ríos Rivera, se encontraba en alto riesgo de desarrollar una infección severa de COVID por su peso y alta presión.

70. Durante su deposición el Dr. Newark opinó que el Sr. Ríos Rivera debió recibir Remdesivir. Sin embargo, el perito de los demandados Dr. Jesús Raúl Casal Hidalgo, opina que para dicha época no se le debía administrar Remdesivir al Sr. Ríos Rivera porque este no tenía COVID 19 severo.

71. Para el Dr. Newark el no utilizar Remdesivir constituyó negligencia médico-hospitalaria. Para el perito de los demandados Dr. Jesús Raúl Casal Hidalgo no.

72. En opinión del perito Dr. Miguel Colón Pérez, el Remdesivir era el único agente antiviral disponible para el COVID.[32]

---

[32] Íd., a las págs. 646-652

En suma, el TPI resolvió que la parte apelada estaba cubierta por la inmunidad concedida por el estatuto federal PREP Act, y acogió la interpretación del estatuto dada por la jurisprudencia citada por la parte apelada. De manera que la decisión de no administrarle *Remdesivir* sino *Decadron* al señor Ríos Rivera, fue una actuación comprendida en las disposiciones de dicha ley. Siendo así, el TPI dictó sentencia sumaria a favor de la parte apelada y desestimó la demanda incoada.

En desacuerdo, el **8 de noviembre de 2024** la parte apelante presentó una *Moción de Reconsideración* en la que planteó los mismos argumentos que señaló en su escrito de oposición a la solicitud de sentencia sumaria.[33] El **23 de noviembre de 2024**, la parte apelada se opuso mediante *Oposición a Moción de Reconsideración.*[34]

El **25 de noviembre de 2024**,[35] el TPI emitió una *Resolución* declarando *No Ha Lugar* la solicitud de reconsideración.[36]

El **26 de diciembre de 2024**, la parte apelante acude ante nos a través de un *Escrito de Apelación* y expone la comisión del siguiente error:

> *Erró el Honorable TPI al desestimar sumariamente la acción indemnizatoria de autos sobre impericia médica y negligencia hospitalaria según la inmunidad concedida por la ley federal Public Readiness and Emergency Preparedness Act [Prep Act], 42 U.S.C. Sec. 24d-6d porque existen genuinas controversias de hecho y derecho en torno a si el lenguaje estatutario y la jurisprudencia interpretativa exceptúan la falta de administración y uso del tratamiento específico Remdesivir contra el COVID-19 del ámbito inmunitario.*

Así las cosas, el **24 de enero de 2025** el Hospital Metropolitano compareció mediante un *Alegato en Oposición a Apelación,* al cual se unieron el doctor Mercedes y SIMED el **20 de febrero de 2025**, por lo que el recurso quedó perfeccionado para la

---

[33] Apéndice XIV del Recurso de Apelación, a las págs. 656-660.
[34] Apéndice XIVa del Recurso de Apelación, a las págs. 661-665.
[35] Notificada el 26 de noviembre de 2024.
[36] Apéndice XV del Recurso de Apelación, a la pág. 666.

determinación del Panel.

## -II-

Reseñados los hechos procesales que originan esta controversia, esbocemos a continuación el derecho aplicable.

## -A-

La Regla 36 de Procedimiento Civil regula el mecanismo procesal de la sentencia sumaria,[37] cuyo propósito principal es facilitar la solución justa, rápida y económica de casos civiles que no presentan controversias genuinas o reales sobre hechos materiales y esenciales.[38] Se considera un hecho material esencial *"aquel que puede afectar el resultado de la reclamación de acuerdo al derecho sustantivo aplicable".[39]* Por lo tanto, procederá dictar una sentencia sumaria:

> *[S]i las alegaciones, deposiciones, contestaciones a interrogatorios y admisiones ofrecidas, en unión a las declaraciones juradas si las hay, u otra evidencia, demuestran que no hay controversia real sustancial en cuanto a algún hecho esencial y pertinente y que[,] como cuestión de derecho[,] el tribunal debe dictar sentencia sumaria a favor de la parte promovente.[40]*

Es decir, este mecanismo podrá ser utilizado en situaciones en las que la celebración de una vista o del juicio en su fondo resultare innecesaria, debido a que el tribunal tiene ante su consideración todos los hechos necesarios y pertinentes para resolver la controversia y solo le resta aplicar el derecho.[41] De manera, que un asunto no debe ser resuelto por la vía sumaria cuando:

> *(1) existen hechos materiales y esenciales controvertidos; (2) hayan alegaciones afirmativas en la demanda que no han sido refutadas; (3) surja de los propios documentos que acompañan la moción una controversia real sobre algún*

---

[37] Regla 36 de Procedimiento Civil, 32 LPRA Ap. V, R. 36.
[38] *Bobé v. UBS Financial Services*, 198 DPR 6, 19-20 (2017).
[39] *SLG Szendrey-Ramos v. Consejo de Titulares*, 184 DPR 133, 167 (2011). *Citas omitidas.*
[40] 32 LPRA Ap. V, R. 36.3(e).
[41] *Mejías v. Carrasquillo*, 185 DPR 288, 299 (2012).

> *hecho material y esencial, o (4) como cuestión de derecho no procede.*[42]

La precitada Regla establece los requisitos de forma que debe satisfacer toda solicitud de sentencia sumaria.[43] El inciso (a) de la Regla 36.3 de Procedimiento Civil dispone que la moción de la parte promovente deberá contener:

> *(1) Una exposición breve de las alegaciones de las partes;*
> *(2) los asuntos litigiosos o en controversia;*
> *(3) la causa de acción, reclamación o parte respecto a la cual es solicitada la sentencia sumaria;*
> *(4) una relación concisa y organizada en párrafos enumerados, de todos los hechos esenciales y pertinentes sobre los cuales no hay controversia sustancial, con indicación de los párrafos o las páginas de las declaraciones juradas u otra prueba admisible en evidencia donde se establecen los mismos, así como de cualquier otro documento admisible en evidencia que se encuentre en el expediente del tribunal;*
> *(5) las razones por las cuales debe ser dictada la sentencia, argumentando el derecho aplicable, y*
> *(6) el remedio que debe ser concedido.*[44]

Asimismo, presentada una moción de sentencia sumaria, la parte promovida no deberá cruzarse de brazos ni descansar exclusivamente en meras afirmaciones o en las aseveraciones contenidas en sus alegaciones.[45] Es preciso que la parte promovida formule —con prueba adecuada en derecho— una posición sustentada con contradeclaraciones juradas y contradocumentos que refuten los hechos presentados por el promovente.[46] Por consiguiente, cualquier duda que plantee sobre la existencia de hechos materiales en controversia no será suficiente para derrotar la procedencia de la solicitud.[47] Es decir, *"[t]iene que ser una duda que permita concluir que existe una controversia real y sustancial sobre hechos relevantes y pertinentes."*[48] Después de todo, *"[l]a etapa procesal para presentar prueba que controvierta los hechos propuestos por una parte en su Moción de Sentencia Sumaria no es*

---

[42] *SLG Szendrey-Ramos v. Consejo de Titulares, supra,* a la pág. 167. *Citas omitidas.*
[43] *SLG Zapata-Rivera v. JF Montalvo,* 189 DPR 414, 431 (2013).
[44] 32 LPRA Ap. V, R. 36.3 (a).
[45] *Rodríguez Méndez v. Laser Eye,* 195 DPR 769, 785 (2016).
[46] *Ramos Pérez v. Univisión,* 178 DPR 200, 214-215 (2010).
[47] *Oriental Bank v. Perapi et al.,* 192 DPR 7, 26 (2014).
[48] *Ramos Pérez v. Univisión, supra,* a la pág. 214.

*en el juicio, sino al momento de presentar una Oposición a la Moción de Sentencia Sumaria, según lo exige la Regla 36 de Procedimiento Civil".*[49]

En ese sentido, la parte promovida también tiene la obligación de cumplir con las exigencias enunciadas en las cláusulas (1), (2) y (3) del inciso (a) de la Regla 36.3 de Procedimiento Civil.[50] Le corresponde citar con especificidad cada uno de los párrafos, según enumerados en la solicitud de sentencia sumaria, que entiende se encuentran en controversia, al igual aquellos que no.[51] Dicha tarea deberá ser realizada de forma tan detallada y específica como lo haya hecho la parte promovente y haciendo referencia a la prueba admisible en la cual se sostiene la impugnación, con cita a la página o sección pertinente.[52]

Asimismo, es menester señalar que al ejercer nuestra función revisora sobre decisiones en las que se aprueba o deniega una solicitud de sentencia sumaria, nos encontramos en la misma posición que los foros de primera instancia.[53] Al tratarse de una revisión de *novo*, debemos ceñirnos a los mismos criterios y reglas que nuestro ordenamiento les impone a los foros de primera instancia, y debemos constatar que los escritos de las partes cumplan con los requisitos codificados en la Regla 36 de Procedimiento Civil, *supra*.[54] A tenor con lo expuesto, el Tribunal Supremo ha pautado lo siguiente:

> *[E]l Tribunal de Apelaciones debe revisar si en realidad existen hechos materiales en controversia. De haberlos, el foro apelativo intermedio tiene que cumplir con la exigencia de la Regla 36.4 de Procedimiento Civil y debe exponer concretamente cuáles hechos materiales encontró que están en controversia y cuáles están incontrovertidos. [...]*
>
> *[Por el contrario], de encontrar que los hechos materiales realmente están incontrovertidos, el foro apelativo intermedio*

---

[49] *Meléndez González et al. v. M. Cuebas*, 193 DPR 100, 122 (2015).
[50] 32 LPRA Ap. V, R. 36.3 (b)(1).
[51] *SLG Zapata-Rivera v. JF Montalvo, supra*, a la pág. 432.
[52] *Íd.; Burgos López et al. v. Condado Plaza*, 193 DPR 1, 17 (2015).
[53] *Meléndez González et al. v. M. Cuebas, supra*, a la pág. 118.
[54] *Íd.*

> *procederá entonces a revisar de novo si el Tribunal de Primera Instancia aplicó correctamente el Derecho a la controversia.*[55]

Desde luego, el alcance de nuestra función apelativa al intervenir en estos casos no comprenderá la consideración de prueba que no fue presentada ante el foro de primera instancia ni la adjudicación de hechos materiales en controversia.[56]

**-B-**

De entrada, el estatuto PREP Act otorga a instituciones y profesionales médicos una inmunidad legal por el uso o administración de contramedidas durante la vigencia de una amenaza de salud pública; esto, cuando haya una relación causal entre el reclamo y la contramedida ejercida.[57]

En primer lugar, el PREP Act define una **"contramedida cubierta"** como un producto pandémico o epidémico cualificado, una contramedida de seguridad, una droga, producto biológico o dispositivo autorizado para uso de la emergencia o aquel dispositivo de protección respiratoria que se considere de uso prioritario durante la emergencia de salud pública.[58] Asimismo, un **"producto pandémico o epidémico calificado"** se refiere, entre otros, a aquella droga, producto biológico o dispositivo manufacturado, utilizado, diseñado, desarrollado para diagnosticar, mitigar, prevenir, tratar o curar una pandemia o epidemia, o para limitar sus efectos dañinos.[59]

En adición, **"persona cubierta"**, con respecto a la administración o uso de una contramedida durante una emergencia de salud pública, se refiere a, entre otros, los planificadores de programas o a las personas calificadas.[60] Los **"planificadores de programas"** son las personas que realizan funciones como

---

[55] *Íd.* a las págs.,118-119.
[56] *Íd.*
[57] 42 USC sec. 247d-6d.
[58] *Íd.*, secs. 247d-6d (i)(1)(A)-(D).
[59] *Íd.*, sec. 247d-6d (i)(7)(A)((i)-(ii).
[60] *Íd.*, secs. 247d-6d (i)(2)(B)(iii) y (iv).

supervisar o administrar un programa relacionado a la administración, dispensación, distribución, provisión o uso de una contramedida de seguridad, de un producto pandémico o epidémico calificado.[61] Mientras que **"personas calificadas"** son los profesionales de la salud autorizados o aquellas personas con facultad para recetar, administrar o dispensar las contramedidas cubiertas.[62] Para efectos del estatuto, **"persona"** incluye tanto individuos como corporaciones.[63]

De manera persuasiva, citamos el caso de *Maney v. Brown,*[64] resuelto por el Tribunal de Apelaciones de Estados Unidos para el Noveno Circuito, que sobre el amplio alcance de la inmunidad que otorga el estatuto PREP Act, expresó lo siguiente:

> *The PREP Act does not explicitly define what it means to administer a countermeasure to an individual under § 247d-6d(a)(1). The phrasing "administration to … an individual of a covered countermeasure" could refer only to the act of physically giving a countermeasure to a particular person—for example, injecting someone with a vaccine shot. However, in § 247d-6d(a)(2)(B), the Act provides that the scope of immunity under paragraph (1) includes various activities with a causal relationship to the administration of a countermeasure beyond injecting someone with a vaccine. Most significantly, subsection (a)(2)(B) lists several terms, including "administration," without reference to "an individual." This is consistent with the expansive causal relationship the subsection provides; for example, the "design, development," "manufacture," and "distribution" of a vaccine are multiple links removed in the chain of events from the ultimate injecting of an individual with a vaccine. By referring to "administration … of [a covered] countermeasure," in the context of a list that expands the conduct within the Act's scope of immunity, and without requiring a direct link to an individual, subsection (a)(2)(B) **broadens the scope of immunity to administrative activities** other than the physical act of directly injecting a particular person with a vaccine.[65]*

La única excepción a la inmunidad bajo el estatuto PREP Act es la muerte o las lesiones físicas graves causadas por la mala conducta intencional. Sobre este particular, el estatuto PREP Act define **mala conducta intencional** como un acto u omisión que se lleva a cabo intencionalmente para lograr un propósito ilícito, a

---

[61] *Íd.,* sec. 247d-6d (i)(6).
[62] *Íd.,* sec. 247d-6d (i)(8)(A).
[63] *Íd.,* sec. 247d-6d (i)(5).
[64] 91 F.4th 1296 (9no Cir. 2024).
[65] *Íd.,* a las págs. 1300-1301. Énfasis nuestro.

sabiendas sin justificación legal o fáctica, sin tener en cuenta un riesgo conocido u obvio de tal magnitud, que hace muy probable que el daño supere el beneficio.[66] Este estándar de responsabilidad es uno más estricto que el estándar de negligencia.[67] Cabe resaltar que, durante la vigencia de una declaración de emergencia de salud pública, ningún Estado puede promover o hacer cumplir una disposición que entre en conflicto con algún requisito relacionado a la contramedida cubierta.[68]

Como bien señaló el TPI, el 4 de febrero de 2020, el Secretario de Salud y Servicios Humanos de los Estados Unidos (en adelante, Secretario) declaró el COVID-19 una emergencia de salud pública e invocó el estatuto PREP Act. En lo pertinente, el Secretario dispuso en la Sección IX del estatuto PREP Act no define de manera explícita el término **"administración"**. No obstante ello, el estatuto le designa la responsabilidad al Secretario proveer las condiciones relevantes en su Declaración. De manera que, el Secretario define **"administración de una contramedida cubierta"** de la siguiente manera:

> [P]hysical provision of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution, and dispensing of the countermeasures to recipients; management and operation of countermeasure programs; or management and operation of locations for purpose of distributing and dispensing countermeasures.
>
> **The definition of "administration" extends only to physical provision of a countermeasure to a recipient**, such as vaccination or **handing drugs to patients**, and to activities related to management and operation of programs and locations for providing countermeasures to recipients, such as decisions and actions involving security and queuing, but only insofar as those activities directly relate to the countermeasure activities. **Claims for which Covered Persons are provided immunity under the Act are losses caused by, arising out of, relating to, or resulting from the administration to or use by an individual of a Covered Countermeasure consistent with the terms of a Declaration issued under the Act.** Under the definition, these liability claims are precluded if they allege an injury caused by a countermeasure, or if the claims are due to manufacture, delivery, distribution, dispensing, or

---

[66] 42 USC sec. 247d-6d (c)(1)(A).
[67] 42 USC sec. 247d-6d (c)(a)(B).
[68] *Íd.*, sec. 247d-6d (b)(8).

> *management and operation of countermeasure programs at distribution and dispensing sites.* [69]

Cónsono con lo anterior, el Secretario interpretó que cuando una Declaración está en vigor, el estatuto PREP Act excluye las demandas sobre daños en las que se alegue, por ejemplo, negligencia por parte de una fabricante en la creación de una vacuna o **negligencia por parte de un proveedor de salud al recetar la dosis incorrecta, a menos que el daño sea el resultado de una mala conducta intencional.**[70] De manera que, la aplicabilidad de la inmunidad prescrita en el estatuto PREP Act **dependerá de los hechos y circunstancias particulares que dan origen a la controversia.**[71]

Por otro lado, y en lo pertinente al COVID-19, el Secretario declaró que una **"contramedida cubierta"** bajo la emergencia provocada por el COVID-19 es:

> *[A]ny antiviral, any other drug, any biologic, any diagnostic, any other device, or any vaccine, used to treat, diagnose, cure, prevent, or mitigate COVID–19, or the transmission of SARS-CoV–2 or a virus mutating therefrom,* or any device used in the administration of any such product, and all components and constituent materials of any such product.[72]

### -III-

De umbral, por estar en la misma posición que el TPI ante la solicitud de sentencia sumaria de la parte apelada y el escrito en oposición de la parte apelante, procedemos a examinar, de *novo*, si ambas partes cumplieron con la Regla 36.3 de Procedimiento Civil. Un análisis de los escritos nos lleva a concluir que ambas partes cumplieron a cabalidad con las disposiciones de la referida regla. En específico, la parte apelada enumeró los hechos esenciales

---

[69] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,200 (Mar. 17, 2020). Énfasis suplido.

[70] *Íd.* Énfasis suplido.

[71] *Íd.*

[72] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,202 (Mar. 17, 2020). Énfasis suplido. Véase, 42 USC sec. 247d-6b(c)(1)(B), 42 USC sec. 247d-6b(i)(1) y (7).

propuestos como incontrovertidos y los sustentó junto con documentos admisibles en evidencia; de igual manera, la parte apelante identificó los hechos pertinentes incontrovertidos y propuso aquellos controvertidos, junto con documentos admisibles en evidencia.

Por todo lo anterior, entendemos que tanto la parte apelante como la apelada cumplieron con las disposiciones exigidas por la Regla 36 de Procedimiento Civil.

A la luz de la normativa expuesta, procedemos a evaluar el error señalado en el recurso ante nuestra consideración.

En síntesis, la parte apelante señala que el TPI incidió al resolver el presente caso por vía sumaria dado que, como cuestión de derecho, a la parte apelada no le ampara la inmunidad concedida por el PREP Act y que existen genuinas controversias de hechos. Lo último, por cuanto las discrepancias de opinión entre los testimonios de los peritos tanto de la parte apelada como de la apelante controvierten la negligencia médico-hospitalaria alegada. No le asiste la razón. Veamos.

En el presente caso, la parte apelada instó una solicitud de sentencia sumaria en las que formuló una extensa lista de hechos materiales, sosteniendo que no estaban en controversia. En apoyo, acompañó con la solicitud una deposición tomada al perito de la parte apelante, el Dr. Ian H. Newmark (en adelante, "Dr. Newmark"), entre otros documentos, de los cuales hicieron una detallada y específica referencia.

De su lado, la parte apelante sometió su oposición con prueba con la que no pudo rebatir los hechos formulados por la parte apelada. Además, aseveró la improcedencia de la disposición sumaria del pleito amparándose en su interpretación de que no eran aplicables las disposiciones del estatuto PREP Act a la controversia.

De antemano, no hay duda de que en el presente caso no

existen controversias fácticas esenciales. De hecho, en la oposición presentada, la parte apelante admite todos los hechos sustanciales propuestos por la parte apelada para la disposición del caso, aunque cualifica varias de sus admisiones. Sin embargo, estas solo se refieren a añadir datos adicionales o proveer una interpretación distinta y no controvierten los hechos en lo absoluto. Cónsono con lo anterior, y al estar en la misma posición que el TPI, adoptamos las setenta y dos (72) determinaciones de hechos materiales incontrovertidos que obran en la referida sentencia, por entender que están sustentados en la prueba que obra en el expediente.

Resuelto que en el presente caso no existen controversias de hechos esenciales, procedemos a resolver la controversia de derecho.

En primer lugar, el estatuto PREP Act aplicó durante el periodo de vigencia de la declaración de emergencia de salud del COVID-19, lo cual en Puerto Rico fue desde el 12 de marzo de 2020 hasta el 11 de mayo de 2023.[73] Por consiguiente, en este caso los hechos ocurrieron entre las fechas del 7 de mayo de 2021 al 17 de mayo de 2021, lo que evidentemente demuestra que el estatuto PREP Act estaba en vigor.

En segundo lugar, surge del expediente que, en el presente caso, se cumplen todos los criterios necesarios para aplicar la inmunidad bajo el PREP Act, a saber: **(1)** Hospital Metropolitano y el doctor Mercedes están cubiertas como personas; **(2)** los medicamentos suministrados *Decadron* y *Medrol Dose Pack*, así como las pruebas realizadas al señor Ríos Rivera constituyen contramedidas cubiertas por esta ley; **(3)** el reclamo de la parte apelante tiene una relación causal con el uso de dichas contramedidas y con las acciones de la parte apelada; y **(4)** la

---

[73] Apéndice IX, a las págs. 119-121 y 137-142.

contramedida se utilizó durante la vigencia de la declaración de emergencia.

Ahora bien, la parte apelante aduce que el no utilizar el medicamento *Remdesivir*, conocido antiviral en contra del COVID-19, fue una omisión que excluye a la parte apelada de la inmunidad conferida por el estatuto PREP Act. Sin embargo, recordemos que, a la fecha en la que ocurrieron los hechos del presente caso, existían limitadas opciones terapéuticas en contra del COVID-19, que incluían tanto el *Decadron* como el *Remdesivir*. Como vimos, el lenguaje del PREP Act es uno sumamente amplio. Además, de acuerdo con la Declaración emitida por el Secretario el 4 de febrero de 2020, se consideraría como contramedida cubierta por el PREP Act **cualquier antiviral, fármaco o producto biológico utilizado para tratar, diagnosticar, curar prevenir o mitigar el COVID-19 o la transmisión del SARS-CoV-2.**[74] Siendo así, no nos convence la interpretación restrictiva que la parte apelante otorga al lenguaje estatutario.

En virtud de lo anterior, el TPI actuó correctamente al dictaminar que la omisión de la parte apelada de administrar *Remdesivir* cae dentro del ámbito de la inmunidad que el referido estatuto confiere. Cabe resaltar que, como bien expuso el foro *a quo*, el presente caso no se refiere a uno en el que al paciente no se le brindó tratamiento alguno para el COVID-19, sino que se refiere a criterios divergentes sobre cuáles tratamientos, todos reconocidos, se debieron utilizar.

En fin, un examen de la totalidad del expediente no revela razón alguna por la cual debamos intervenir con el dictamen del TPI por disponer sumariamente del pleito y desestimar la demanda

---

[74] Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against COVID-19, 85 Fed. Reg. 15,202 (Mar. 17, 2020).

incoada. En ausencia de pasión, prejuicio, parcialidad o error manifiesto, confirmamos la determinación del foro apelado.

## -IV-

Por los fundamentos antes expuestos, **confirmamos** la *Sentencia* dictada por el Tribunal de Primera Instancia, Sala Superior de San Juan.

Lo acordó el Tribunal y certifica la secretaria del Tribunal de Apelaciones. El Juez Sánchez Báez disiente por escrito.

Lcda. Lilia M. Oquendo Solís
Secretaria del Tribunal de Apelaciones

Panel integrado por su presidente, el Juez Rodríguez Casillas, el Juez Marrero Guerrero, el Juez Campos Pérez y el Juez Sánchez Báez

## VOTO DISIDENTE DEL JUEZ ISAÍAS SÁNCHEZ BÁEZ

En San Juan, Puerto Rico, a 29 de mayo de 2025.

A modo general, la inmunidad en cuestión aplica cuando una persona tiene algún daño, pérdida o reclamación que surja o que resulte de la administración o utilización de una contramedida aceptada para combatir la pandemia o epidemia de la cual se trate. Es decir, deben confluir dos requisitos claves, a saber: (1) la administración o uso de la contramedida, y (2) que el daño o pérdida alegada tenga un nexo causal con la contramedida. Adelanto que, en el caso de epígrafe, no existe ese nexo causal toda vez que el daño que se alega surgió al no usar o no administrar una contramedida del antiviral *Remdesivir*.

La diferencia interpretativa que me lleva a disentir la ilustrada mayoría de este Panel, consiste en que estimo que el estatuto aplicable, a pesar de ser abarcador, no incluye la inmunidad por



---

[1] Mediante la Orden Administrativa DJ 2024-062C emitida el 6 de mayo de 2025, se enmendó la constitución de los paneles del Tribunal de Apelaciones.

reclamaciones en torno al "no uso" o la "no administración" de una contramedida a un paciente. Esto surge tanto del propio lenguaje del estatuto, así como de las interpretaciones que han hecho distintos tribunales federales, incluyendo las interpretaciones realizadas por la propia Corte de Apelaciones de los Estados Unidos para el Noveno Circuito (en adelante, "Noveno Circuito"), citado por la mayoría de este Panel para sustentar la decisión a la cual hoy acuerdan.

En este caso, la reclamación hecha por los apelantes precisamente tiene que ver con la no utilización de una contramedida. En específico, la no utilización del antiviral conocido como *Remdesivir* como parte de las medidas implementadas para su tratamiento y mitigación contra el COVID-19. Por tanto, concluyo que la inmunidad reclamada no aplica ante las circunstancias particulares del presente caso. Veamos.

El estatuto conocido como Public Readiness and Emergency Preparedness Act, 42 USC sec. 247d-6d (en adelante, "PREP Act"), fue aprobado por el Congreso de los Estados Unidos con el propósito de motivar el desarrollo y distribución de contramedidas que ayuden a combatir una emergencia de salubridad pública. Mediante esa legislación, el Congreso autorizó al Secretario del Departamento de Salud Federal (*Secretary of Health and Human Services*, conocido por sus siglas en inglés como "HHS"), a declarar una emergencia de salud y limitar la responsabilidad legal que surja por daños o pérdidas que resulten de la administración de cualquier contramedida a un individuo. Las contramedidas incluyen desde vacunas hasta cualquier aparato que se utilice para el diagnóstico y tratamiento. Véase, Kevin J. Hickey, Cong. Rsch. Serv., LSB10443, The PREP Act and COVID-19, Part 1: Statutory Authority to Limit Liability for Medical Countermeasures, https://crsreports.congress.gov/product/pdf/LSB/LSB10443

(publicado el 13 de abril de 2022; última visita el 5 de mayo de 2025) ("covered persons are generally immune from legal liability (i.e., they cannot be sued for money damages in court) for losses relating to the administration or use of covered countermeasures against COVID-19.").

El PREP Act, dispone en lo pertinente, como sigue:

**(a) Liability protections**
**(1) In general**
Subject to the other provisions of this section, a covered person shall be immune from suit and liability under Federal and State law with respect to *all claims for loss caused by, arising out of, relating to, or resulting from the administration to or the use by an individual of a covered countermeasure* if a declaration under subsection (b) has been issued with respect to such countermeasure.

**(2) Scope of claims for loss**
**(A) Loss [...]**

**(B) Scope**
The immunity under paragraph (1) applies to *any claim for loss that has a causal relationship with the administration to or use by an individual of a covered countermeasure*, including a causal relationship with the design, development, clinical testing or investigation, manufacture, labeling, distribution, formulation, packaging, marketing, promotion, sale, purchase, donation, dispensing, prescribing, administration, licensing, or use of such countermeasure.

**(3) Certain conditions**
Subject to the other provisions of this section, *immunity under paragraph (1) with respect to a covered countermeasure applies* only *if--*
**(A)** *the countermeasure was administered or used* during the effective period of the declaration that was issued under subsection (b) with respect to the countermeasure;
**(B)** *the countermeasure was administered or used* for the category or categories of diseases, health conditions, or threats to health specified in the declaration; and
**(C)** in addition, in the case of a covered person who is a program planner or qualified person with respect to the administration or use of the countermeasure, the countermeasure was administered to or used by an individual who--
**(i)** was in a population specified by the declaration; and
**(ii)** was at the time of administration physically present in a geographic area specified by the declaration or had a connection to such area specified in the declaration.

42 USC sec. 247d-6d (negrillas en original, subrayado e itálico añadido).

Del lenguaje de la explicación general de la limitación de responsabilidad, se puede identificar claramente la inmunidad como aquella reclamación por alguna pérdida causada, relacionada con o que sea el resultado de la administración o la utilización de alguna

contramedida, mientras esté declarada la emergencia de salubridad. Como si ese lenguaje del párrafo (a)(1) fuera poco, en el párrafo (a)(2)(B) se define el alcance de la inmunidad reiterando que aplica a aquellas pérdidas que tengan un nexo causal con la "administración o uso" de una contramedida cubierta. Más adelante, en el párrafo (a)(3), el Congreso insistió en disponer que la referida inmunidad aplicaría únicamente (*only if*) si la contramedida fue *administrada o utilizada* durante el periodo de efectividad de la declaración de emergencia y administrada para las categorías de enfermedades o condiciones de salud especificadas en la declaración de emergencia, entre otros requisitos.

El PREP Act no define lo que es "administration or the use" de una contramedida. No obstante, el Secretario de Salud Federal utilizó sus poderes delegados en el PREP Act para definirlo de la manera siguiente:

> **Administration of the Covered Countermeasure means *physical provision* of the countermeasures to recipients, or activities and decisions directly relating to public and private delivery, distribution and dispensing of the countermeasures to recipients, management and operation of countermeasure programs, or management and operation of locations for the purpose of distributing and dispensing countermeasures.**
>
> **Where there are limited Covered Countermeasures, not administering a Covered Countermeasure to one individual in order to administer it to another individual can constitute "relating to . . . the administration to . . . an individual" under 42 U.S.C. 247d-6d.** For example, consider a situation where there is only one dose of a COVID-19 vaccine, and a person in a vulnerable population and a person in a less vulnerable population both request it from a healthcare professional. In that situation, the healthcare professional administers the one dose to the person who is more vulnerable to COVID-19. In that circumstance, the failure to administer the COVID-19 vaccine to the person in a less-vulnerable population "relat[es] to . . . the administration to" the person in a vulnerable population. The person in the vulnerable population was able to receive the vaccine only because it was not administered to the person in the less-vulnerable population. Prioritization or purposeful allocation of a Covered Countermeasure, particularly if done in accordance with a public health authority's directive, can fall within the PREP Act and this Declaration's liability protections.
>
> Fourth Amendment to the Declaration Under the Public Readiness and Emergency Preparedness Act for Medical Countermeasures Against

COVID-19 and Republication of the Declaration, 85 FR 79190-01. (Énfasis suplido y notas al calce omitidas).

En resumen, la administración de contramedidas debe ser entendido como el proveer físicamente una contramedida a un recipiente, o actividades o decisiones directamente relacionadas a la entrega, distribución o la dispensa afirmativa de contramedidas a los recipientes.

Ahora bien, el segundo párrafo contiene una excepción particular que incluye la no administración de una contramedida como parte de la inmunidad cuando ello tiene el propósito poder administrar la contramedida a otra persona. Es decir, en casos en los que existan contramedidas limitadas, se considera como parte de la definición de la inmunidad el dejar de administrar una contramedida a una persona para administrarla afirmativamente a otra persona con una necesidad o vulnerabilidad mayor.

La decisión de no administrar una contramedida durante la declaración de una emergencia de salubridad se ha interpretado por varios tribunales federales y estatales como que está fuera del alcance de la inmunidad que provee el PREP Act. A manera ilustrativa y persuasiva, en *Sherod v. Comprehensive Healthcare*, No. 20CV1198, 2020 WL 6140474, at *1 (W.D. Pa. Oct. 16, 2020), el demandante alegó que la muerte de la persona por la cual se reclamó se debió a que fue expuesta al virus SARS-CoV-19 en su lugar de trabajo, un centro de rehabilitación. La causa de acción allí en cuestión consistió en la negligencia de los demandados por no proveerle el equipo de protección personal. Según las alegaciones de la demanda, la falta de proveer esas contramedidas causó la muerte de la empleada. Ante esto, el tribunal concluyó que los reclamos por alegada negligencia "are not causally connected to [the employer's use of covered countermeasures. Thus Plaintiffs' allegations do not fall within the purview of the PREP Act." *Id.* Más aun, esa Corte,

citando a Estate *Maglioi v. Andover Subacute Rehab Ctr.*, 478 F.Supp.3d 518, 531 (DNJ 2020), concluyó que las medidas adoptadas en el PREP Act fueron "designed to protect those who employ countermeasures, not those who decline to employ them." Véase, además, *Tercero by & through Silva v. Orinda Care Ctr., LLC*, No. 21-CV-05563-JSW, 2022 WL 256511, at *2 (N.D. Cal. Jan. 3, 2022))("Plaintiffs allege that decedent died from Covid-19 based on a negligent failure to protect her rather than from any affirmative efforts to treat the disease or administer countermeasures as would be required to fall under the Act's rubric").[2]

El único caso utilizado por la mayoría de este Panel para fundamentar su interpretación del PREP Act es *Maney v. Brown*, 91 F.4th 1296 (9th Cir. 2024). Los demandantes en ese caso eran unos miembros de la población correccional que contrajeron COVID-19, mientras se encontraban bajo la custodia de cárceles del estado de Oregon. Mediante una demanda de clase solicitaron el resarcimiento de daños contra las autoridades del estado quienes ante la escasez de las vacunas contra el COVID-19, decidieron priorizar su uso y administración a poblaciones vulnerables, lo que conllevó a su vez no priorizar la administración de esas vacunas a la población correccional.

La mayoría de este Panel resalta que en ese caso el tribunal expresó que la subsección (a)(2)(B) del PREP Act amplía el marco de acción de la inmunidad a actividades administrativas más allá del acto físico de inyectar la vacuna a una persona particular. Sin embargo, esas expresiones tienen un contexto muy particular que el propio Noveno Circuito aclaró en los próximos párrafos.

---

[2] Durante la epidemia de la influenza H1N1 del año 2009 hubo controversias similares. En *Casabianca v. The Mount Sinai Medical Center*, 2014 WL 1043521, at *4 (N.Y. Sup. Ct. 2014), un tribunal de Nueva York concluyó que no aplicaba la inmunidad del PREP Act a los facultativos médicos que decidieron no proveerle la vacuna para esa condición a un paciente hospitalizado. Ese tribunal llegó a esa conclusión luego de hacer una interpretación del lenguaje del estatuto en cuestión.

En primer lugar, el Noveno Circuito razonó que según la definición provista por el Secretario de Salud Federal en su declaración de emergencia, la priorización o la decisión de proveerle vacunas a un grupo de personas con prioridad sobre otros, es una actividad que se relaciona directamente con el manejo de las contramedidas, por lo que está cubierto expresamente por la inmunidad del PREP Act. *Íd.*, pág. 1301. Nótese que aun en esa excepción, a una persona le administraron la contramedida, mientras que la no administración a la otra persona está directamente excusada por el problema de escasez y priorización.

En segundo lugar, tan solo dos párrafos luego de esas expresiones, reconoció que el propio Noveno Circuito en *Hampton v. California,* 83 F.4th 754, 762 (9th Cir. 2023) expresó lo siguiente:

> [W]e held that "the PREP Act provides immunity only from claims that relate to 'the administration to or the use by an individual of' a covered countermeasure—**not such a measure's** *non-***administration or** *non-***use."** *Hampton,* 83 F.4th at 763 (emphasis in original). However, **we distinguished prioritization of a scarce countermeasure from non-administration or non-use, and we explained that,** "**for a countermeasure with limited availability, administering the countermeasure to one person could mean withholding it from another."** *Id.*

*Maney v. Brown,* supra, pág. 1301. (Negrillas suplidas).

Es decir, más allá de la excepción antes discutida, el propio caso citado por la mayoría de este Panel reconoce que el PREP Act, como regla general, solo provee inmunidad en casos cuyas reclamaciones se relacionan a la administración o uso de una contramedida, mas no provee inmunidad cuando se trata de una reclamación por la no administración o el no uso de la contramedida.

En tercer lugar, no puedo coincidir con esa lectura de la subsección (a)(2)(B) del PREP Act porque simplemente no tiene apego al texto. Lo que en realidad hace la referida subsección es aclarar que la inmunidad aplicará y existirá nexo causal aun en aquellos casos en los que la reclamación se relacione a la

manufactura de las contramedidas, su distribución y venta, entre otras etapas que conlleva hacer llegar la contramedida al recipiente. No obstante, al inicio de la subsección se reitera en que debe existir un uso o administración de la contramedida. En otras palabras, lo que significa esa subsección es que una vez administrada o utilizada en un individuo o paciente, la inmunidad cubrirá a todo el espectro de actores y acciones que se deben llevar a cabo para desarrollar, producir y entregar una contramedida al recipiente final. Debe recordarse que el propósito del PREP Act es motivar el desarrollo de esas contramedidas.

Por último, los hechos que dieron base a la reclamación en *Hampton v. California*, supra, se originaron en una cárcel llamada *California Instituion for Men*. Allí se sufrió un brote serio de COVD-19, por lo cual los altos oficiales correccionales de ese estado decidieron transferir a 122 miembros de la población correccional que no habían presentado síntomas de la enfermedad a otra prisión llamada *San Quentin State Prison*. En esta última prisión no había ningún caso de infección del virus. Sin embargo, esa transferencia provocó que en poco tiempo se infectaran más de dos mil miembros de la población correccional de San Quentin, lo que culminó en la muerte de sobre veinticinco miembros de la población correccional y un oficial correccional. Así pues, la esposa de un miembro de la población correccional fallecido instó una demanda contra los oficiales correccionales y el Estado de California. Sostuvo que la muerte fue causada en parte porque los demandados fallaron en no administrarle pruebas de COVID-19 a los miembros de la población correccional que serían transferidos, además de otras medidas en protección del resto de la población correccional. Los demandados solicitaron la desestimación de la demanda basados en la aplicación de la inmunidad del PREP Act. Sin embargo, el Noveno Circuito concluyó lo siguiente:

> The surrounding verbal phrases—"caused by," "arising out of," and "resulting from," § 247d-6d(a)(1)—all connote some type of causal relationship. **At the very least, then, for PREP Act immunity to apply, the underlying use or administration of a covered countermeasure must have played some role in bringing about or contributing to the plaintiff's injury. It is not enough that some countermeasure's use could be described as relating to the events underpinning the claim in some broad sense.**

*Hampton v. California*, supra, pág. 764. (Énfasis suplido).

En el caso de epígrafe, el señalamiento de error de los apelantes consiste precisamente en que el foro primario interpretó que la inmunidad del PREP Act aplica a las alegaciones de impericia médica y negligencia hospitalaria al no recetarle *Remdesivir* al Sr. Miguel Ríos Rivera (en adelante, "señor Ríos Rivera" o "paciente").

A tono con la interpretación del propio lenguaje del PREP Act, así como la jurisprudencia persuasiva examinada, me parece que los apelantes tienen la razón, al menos en esta etapa de los procedimientos. La inmunidad concedida a los apelados es inaplicable al caso de autos. El foro primario erró al desestimar la *Demanda* de epígrafe, toda vez que la causa de acción —según planteada por los apelantes— tiene que ver con la *no administración o el no uso* de la contramedida conocida como *Remdesivir*. Sin embargo, como vimos antes, la inmunidad del PREP Act no se extiende a ese tipo de alegación. Por esa razón, hubiese revocado la sentencia apelada por haberse cometido un error de derecho.

La mayoría de este Panel, sin embargo, haciendo una interpretación amplia del PREP Act, concluyó que existe una relación causal entre el reclamo de los apelantes y el uso de las contramedidas y las acciones de los apelados. Asimismo, estimó correcta la conclusión del foro *a quo* a los efectos de que el presente caso no trata sobre un paciente a quien no se le brindó tratamiento alguno para el COVID-19, "sino que se refiere a criterios divergentes sobre cuáles tratamientos... se debieron utilizar".

En cuanto a la primera conclusión, no puedo estar de acuerdo toda vez que la relación causal a la que se refiere el texto puro del estatuto en cuestión es del daño o pérdida con la administración o el uso de alguna contramedida avalada por el Secretario de Salud Federal. Ciertamente al señor Ríos Rivera —paciente del presente caso— se le brindaron varias contramedidas. Sin embargo, ello no es suficiente para concluir que aplica la inmunidad sin que exista una relación de causalidad. Nótese que, las pruebas utilizadas para diagnosticar COVID-19 son contramedidas, por lo que en el razonamiento de la mayoría cabría el activar la inmunidad al meramente realizar la prueba, sin proveerle al paciente ningún otro tipo de cuidado necesario y disponible para ese paciente particular. No me parece que ese razonamiento vaya a tono con el propósito del PREP Act.

De lo que no tengo duda es que la reclamación en el presente caso no tiene nada que ver con algún daño sufrido por esas contramedidas que sí se le administraron al paciente, sino todo lo contrario, la reclamación precisamente surge por la no administración del antiviral conocido como *Remdesivir*. Por tanto, en el caso de autos, no existe nexo causal entre el alegado daño y las contramedidas que sí se utilizaron, requisito *sine qua non* para activar la inmunidad.

Según las determinaciones de hechos del foro primario, el perito de los apelantes, el Dr. Ian H Newmark —Jefe de la División de Medicina Pulmonar del Syosset Hospital en New York— (en adelante, "Dr. Newmark"), opinó que se le debió recetar *Remdesivir* al señor Ríos Rivera en lugar de sólo haber utilizado la dexametasona. Asimismo, el Dr. Newmark declaró que en su experiencia la gran mayoría de los pacientes de COVID-19 que reciben el *Remdesivir* oportunamente, no fallecen; y que el no haber utilizado el *Remdesivir* en el presente caso constituyó una

negligencia médico-hospitalaria. Véanse, las determinaciones de hechos núm. 64-72 de la *Sentencia* en el Apéndice de los apelantes, anejo XIII, pág. 652. En cambio, el perito de los apelados, Dr. Jesús Raúl Casal Hidalgo, opinó que para la época en cuestión no se le debía recetar *Remdesivir* al señor Ríos Rivera toda vez que no tenía COVID-19 severo y que el hecho de no haber recetado el referido antiviral, no constituyó negligencia médico hospitalaria.

Ante estos hechos y opiniones contradictorias de los peritos, puedo concurrir con la segunda conclusión del Panel a los efectos de que la controversia en el presente caso, lejos de ser sobre la inmunidad inaplicable, consiste en los criterios divergentes sobre cuáles tratamientos se debieron utilizar. El problema es que, respecto a esa controversia, nada o muy poco se ha litigado en la etapa de la sentencia sumaria, por lo cual no estamos en posición de determinar si es o no de aplicabilidad la referida defensa.

Así pues, una vez devuelto el caso, el foro primario tendría entonces la encomienda de determinar si el cuidado hospitalario y el tratamiento médico del señor Ríos Rivera —paciente fallecido en el caso de epígrafe— fue conforme a las normas generalmente aceptadas para la buena práctica médica y la buena administración de cuidado y tratamiento hospitalario, <u>bajo las circunstancias específicas del caso durante el periodo específico en que ocurrieron los hechos.</u> Asimismo, estaría en posición de resolver los méritos de cualquier defensa afirmativa que sea planteada y probada por los apelados, incluyendo la defensa de los criterios divergentes. Cabe señalar que, la defensa de criterios divergentes no aplica automáticamente porque dos peritos tengan criterios opuestos, sino que "sólo ha sido aplicada a diferencias entre autoridades médicas en una misma disciplina o especialidad". *Blas v. Hosp. Guadalupe*, 146 D.P.R. 267, 296 (1998). Sin embargo, no es de aplicabilidad cuando existen unos criterios uniformes generalmente aceptados

como correctos por todos los peritos médicos. Todo lo anterior es materia de prueba que debe ser dilucidada por el foro primario.

Debo aclarar que nada de lo previamente expresado significa que he prejuzgado los méritos de esta controversia. Mis expresiones se ciñen estrictamente a la controversia planteada sobre la inmunidad. Ciertamente, los tiempos extraordinarios por los cuales nuestra sociedad pasó al enfrentar el COVID-19 pudieran requerir defensas y explicaciones extraordinarias, fuera de lo que es común en el litigio de este tipo de causa de acción. Con esto quiero decir que a los apelantes pudieran asistirle varias defensas afirmativas, incluso algunas de carácter extraordinario de acuerdo con los tiempos vividos, la inexactitud o imprecisión de la ciencia, y los cambios constantes en las recomendaciones médicas, entre otros. Sin embargo, esas son defensas afirmativas que hasta este momento no han sido probadas.

En fin, lo que está claro es que en el presente caso no aplica la inmunidad del PREP Act. Por tal razón, hubiese revocado la *Sentencia* apelada y devuelto el caso para la continuación de los procesos.

**ISAÍAS SÁNCHEZ BÁEZ**
Juez del Tribunal de Apelaciones